IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| KIMBERLY FREEMAN, in her individual capacity; and C.B., a minor, by and through his parent, Kimberly Freeman,<br><br>        Plaintiffs,<br><br>   v.<br><br>MARBELY SANCHEZ, in her individual capacity; GREGORY J. SEABOLT, in his official capacity as Sheriff of Randolph County; and CINCINNATI INSURANCE COMPANY, in its capacity as Surety on the Official Bond of the Sheriff of Randolph County,<br><br>        Defendants. | 1:24CV414 |

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

This case involves claims arising from a law enforcement officer's shooting of a dog on the owner's property. Before the court is Plaintiffs' motion for leave to file an amended complaint (Doc. 18), and Defendants' motion for summary judgment (Doc. 23). Both motions are fully briefed and ready for decision. For the reasons stated below, Plaintiff's motion for leave to amend will be granted, and Defendants' motion for summary judgment will be granted in part and denied in part.

## I. BACKGROUND

The facts presented, viewed in the light most favorable to Plaintiffs as the non-movants as to Defendants' motion for summary judgment, show the following:

On April 1, 2022, Defendant Marbely Sanchez drove to a home shared by Larry Freeman, Plaintiff Kimberly Freeman, and C.B., Kimberly Freeman's minor son. (Doc. 26-3 at 14-15.) Sanchez, a deputy with the Randolph County Sheriff's Office, was attempting to serve Larry Freeman with a show cause order for alleged delinquent child support obligations. (Id. at 9, 15.) At the time, the Freemans and C.B. lived in a double-wide mobile home with their dog, Major, a 120-pound Rottweiler. (Doc. 24-4 at 3, 9.)

The Freeman home had a front door with steps, back deck with steps, and carport. (Id. at 10.) Their property also had an "outbuilding" behind the house that the family used to store lawncare equipment. (Id.) The Freemans' front porch bears the street number address and a "Welcome" sign that hangs from the front door:

2



(Doc. 26-4.)

  The Freemans' back deck is offset from the street that leads to their property by the carport and is not visible from their driveway. (Doc. 24-4 at 11-12; Doc. 26-3 at 18.) There are two doors on the back deck: a screened, sliding-glass door that leads to the kitchen (Doc. 26-5 ¶ 6), and a separate door that leads to a 550 square-foot addition to the home which serves as the Freemans' bedroom. (Doc. 24-4 at 9.) A dog door sits between the sliding-glass door and the door to the bedroom. (Id. at 11.) The back porch is pictured here:



(Doc. 26-8.)

An aerial photograph of the Freemans' property submitted by Plaintiffs is included here:



(Doc. 26-7.)

Sanchez parked on the front side of the Freeman home with the front porch in view. (Doc. 26-3 at 17, 19.)  She made her way to the front door, intending to serve Larry Freeman with the show cause order.  (Id. at 15, 19.)  She knocked on the front door. (Id. at 25.)  Sanchez heard Major barking inside.  (Id. at 27.) Freeman and C.B. were in the home (Doc. 24-4 at 16-17), but neither answered (Doc. 26-3 at 28).

After waiting for "some amount of time," Sanchez left the front door and walked through the carport and to the back of the

5

home. (Id. at 26.) Unlike the front entrance, Sanchez could not see the Freemans' back deck from her parked patrol car. (Id. at 17-19.) At her deposition, Sanchez said that she had not seen anyone in the home's backyard, she did not have any indication that someone was behind the home, and she did not hear anything from the backyard that suggested the homeowners would be present there. (Id. at 21.) But Sanchez surmised that the backyard was the Freemans' "main access point" because a path leading into the backyard was well-worn.[1] (Id.)

Sanchez says she ventured along the "worn path" through the carport to the backyard. (Id. at 28.) Thus, she walked under the carport and into the backyard. (Id. at 32.) She could see the Freemans' back deck from the backyard. (Id.) Sanchez scaled the five deck steps, approached the sliding glass door to the kitchen, and knocked again. (Id. at 33.) She says she did not notice the dog door at this point. (Id. at 35.) After knocking, she immediately returned to the deck stairs. (Id. at 33.)

As Sanchez neared the deck steps, Major came onto the deck through his dog door and barked at her. (Id. at 41, 46.) According to Sanchez, Major was "growling and barking and snarling." (Id. at 46.) The commotion roused Kimberly Freeman, who dressed in her bedroom and made her way toward the back deck. (Doc. 24-4 at 17.)

_____

[1] At her deposition, Kimberly Freeman testified that the family "would always use the front door" and never the back door. (Doc. 24-4 at 11.)

6

When she opened the door, she saw Sanchez draw her firearm and shoot Major. (Id. at 18.) Ms. Freeman says that immediately before the shooting Major was "standing still, barking" and that he merely "appeared defensive, not aggressive." (Doc. 26-5 ¶ 7.)

The parties dispute several key aspects of the incident. Kimberly Freeman claims that Major was approximately ten feet away from Sanchez when she shot him. (Id. at 19.) She also said that although Major was barking at Sanchez and "appeared defensive," he did not seem aggressive and was "too far away from [Sanchez] to bite her or jump on her when she shot him." (Doc. 26-5 ¶¶ 7-8.) Sanchez says that Major presented an imminent threat to her safety and was preparing to "charge and maul" her. (Doc. 26-3 at 46.) She testified that Major was approximately two feet away from her when she shot him. (Id. at 49.) And because Major posed an immediate threat, Sanchez said, she did not have the time to deploy less lethal measures, such as her pepper spray. (Id. at 44, 50.)

C.B., who was then thirteen years old, also observed the incident through the kitchen window. (Doc. 26-2 at 10.) At his deposition, he said that Sanchez was on the middle of the stairs leading up to the back deck when she shot Major. (Id. at 6.) He did not have a clear view of Major's position on the porch. (Id. at 7, 10.) Major initially survived the shooting, but the Freemans decided to euthanize him in December 2022 because he allegedly

became too aggressive as a result of the shooting. (Doc. 26-1 at 30.)

Sanchez had served hundreds of civil orders prior to April 1, 2022. (Doc. 26-3 at 7.) She had encountered dogs while doing so. (Id. at 3-4.) When a dog threatened her, she had a practice of deploying her pepper spray to repel the animal. (Id.) She reported that she had done precisely that no fewer than 25 times. (Id. at 4.) Pepper spray had successfully repelled the dog each time. (Id. at 5, 8.) Although she was armed with her pepper spray on the day in question, Sanchez did not use it. (Id. at 11, 44.)

On May 17, 2024, Kimberly Freeman and C.B. filed this action against Sanchez in her individual capacity, Gregory J. Seabolt in his official capacity as Sheriff of Randolph County, and Cincinnati Insurance Company as surety on the official bond of the Sheriff of Randolph County. (Doc. 1.) Plaintiffs asserted claims pursuant to 42 U.S.C. § 1983 for deprivation of their rights under the Fourth and Fourteenth Amendments to the United States Constitution, and state law claims of trespass, trespass to chattels, conversion, assault, intentional infliction of emotional distress, and negligent infliction of emotional distress. (Id. ¶¶ 36-120.)

## II. ANALYSIS

### A. Motion to Amend

Plaintiffs first seek leave to file an amended complaint

8

pursuant to Federal Rule of Civil Procedure 15(a) and 16(b), as well as this court's local rule 15.1. (Doc. 18.) Their proposed amended complaint seeks to add "two new parties and one new claim." (Doc. 19 at 1.) It adds two Randolph County Sheriff Office employees, Neil Blackmon and David MacFayden, who allegedly trained Sanchez to serve civil papers, as Defendants for Plaintiffs' first cause of action and asserts a <u>Monell</u>[2] claim against Seabolt and Cincinnati Insurance Company alleging that Randolph County maintained a policy for serving legal papers that violated the constitutional rights of Randolph County residents. (<u>Id.</u> at 3.)

Defendants oppose amendment, arguing that any amendment is untimely, Plaintiffs have not demonstrated good cause to amend the case scheduling order as required by Federal Rule of Civil Procedure 16, and the proposed amendment is futile. (Doc. 20 at 1.) Plaintiffs counter that the "facts underlying the present amendment were not known when the deadline for amending pleadings passed," that they "have diligently pursued discovery," and that they promptly sought to amend the complaint after discovering the basis for their new claim during Sanchez's deposition. (Doc. 19 at 5.) Defendants respond that Plaintiffs could have discovered the basis for their new claim earlier if they had been diligent

---

[2] <u>See</u> <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978).

during discovery.  (Doc. 20 at 4–5.)  Specifically, they argue that Defendants produced Sanchez's training and personnel file and the Randolph County Sheriff's Office policies and procedures on September 24, 2024, which could have led Plaintiffs to discover their basis for any Monell claim over a month in advance of the scheduling order's deadline for adding parties.  (Id. at 4.) Defendants further argue that even if Plaintiffs had demonstrated good cause for leave to amend, the motion should be denied because the proposed amendment is futile.  (Id. at 5.)  Finally, Plaintiffs respond that the documents Defendants produced discussing Sanchez's training and Randolph County's policies did not indicate that it was "standard practice to approach homes' back doors." (Doc. 21 at 3.)  They also point out that the documents did not "identify Blackmon and MacFayden as Sanchez's trainers, let alone suggest that they trained her to approach homes' back doors without a warrant."  (Id.)

Federal Rule of Civil Procedure 15 provides that a plaintiff may amend a complaint once as a matter of course within 21 days after the earlier of (1) service of a responsive pleading or (2) service of a motion under Federal Rule of Civil Procedure 12(b), (e), or (f).  After that period, a party may amend only with either the opposing party's written consent or leave of court.  Fed. R. Civ. P. 15(a)(2); Foman v. Davis, 371 U.S. 178, 182 (1962) (noting that "the grant or denial of an opportunity to amend is within the

10

discretion of the District Court"). While district courts have discretion to grant or deny a motion to amend, the Fourth Circuit has interpreted Rule 15(a) to provide that "leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006) (citation omitted); Foman, 371 U.S. at 182 (same). Rule 16, which governs the court's issuance of a scheduling order among other matters, states that the court's schedule "may be modified only for good cause" and with the court's consent. Fed. R. Civ. P. 16(b)(4).

If the proposed amendment "advances a claim or defense that is legally insufficient on its face, the court may deny leave to amend." Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 225 (8th Cir. 1994) (citation modified); see Joyner v. Abbott Lab'ys., 674 F. Supp. 185, 190 (E.D.N.C. 1987) (same). "To determine whether a proposed amended complaint would be futile, the Court reviews the revised complaint under the standard used to evaluate a motion to dismiss for failure to state a claim." Amaya v. DGS Constr., LLC, 326 F.R.D. 439, 451 (D. Md. 2018) (citing Katyle v. Penn Nat'l Gaming, Inc., 637 F.3d 462, 471 (4th Cir. 2011)). Thus, "[a] motion to amend a complaint is futile 'if the proposed claim would not survive a motion to dismiss.'" Pugh v.

11

<u>McDonald</u>, 266 F. Supp. 3d 864, 866 (M.D.N.C. 2017) (quoting <u>James Madison Ltd. v. Ludwig</u>, 82 F.3d 1085, 1099 (D.C. Cir. 1996)).

Plaintiffs have shown good cause for their proposed amendment. To be sure, Defendants have not argued, much less demonstrated, that amendment would be prejudicial to them or that Plaintiffs sought to amend the complaint in bad faith. <u>See</u> <u>Laber</u>, 438 F.3d at 426. At most, Defendants suggest that Plaintiffs could have uncovered the basis for their new <u>Monell</u> claim and for adding Blackmon and MacFayden as Defendants sooner if they had conducted discovery more quickly. But Plaintiffs have persuasively argued that the predicate for their <u>Monell</u> claim was not evident in the documents Defendants produced prior to Sanchez's deposition, and that Defendants learned only during that deposition that Blackmon and MacFayden trained Sanchez. Because Plaintiffs have diligently conducted discovery and expeditiously moved for amendment once they discovered a basis to add new defendants and a new claim, they have shown good cause for leave to amend. <u>See</u> <u>EEOC v. Hooters of Am., LLC</u>, 347 F.R.D. 445, 448 (M.D.N.C. 2024) ("The touchstone of good cause under Rule 16(b) is diligence." (citations omitted)).

Defendants' arguments that the proposed amendment is futile are unconvincing. Defendants first argue that the proposed claim against Blackmon and MacFayden is not cognizable. (Doc. 20 at 6.) They maintain that "failure to train is a theory of municipal liability under <u>Monell</u>," and that "<u>Monell</u> does not apply to

12

individual capacity claims." (Id.) Defendants further contend that because "there are no allegations that Blackmon and MacFayden participated in the entry and search of Freeman's property" and section 1983 liability is personal, the claim against them must be dismissed. (Id. at 7–8.) And they argue that Plaintiffs have failed to allege an actionable supervisory liability claim under section 1983. (Id. at 8–9.) On Plaintiff's proposed Monell failure to train claim against Sheriff Seabolt, Defendants argue that Plaintiffs failed to allege that he was "deliberately indifferent in training his officers." (Id. at 11.) Because of this, and because Plaintiffs did not allege "a pattern of similar constitutional violations which could give rise to a failure to train claim," they suggest amendment is futile in this respect as well. (Id.)

Defendants' arguments are unpersuasive. Their contention that Plaintiffs' "failure to train" claim cannot be lodged against Blackmon and MacFayden in their individual capacities is mistaken. Plaintiffs have asserted a section 1983 claim against them under a theory of supervisory liability, which the Fourth Circuit has recognized as actionable. Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). Moreover, predicates for liability under this theory, such as whether Sanchez's supervisors were deliberately indifferent to or tacitly authorized her offending conduct, are generally issues of fact, not questions of law. Id. at 799 (citing

13

<u>Avery v. Cnty. of Burke</u>, 660 F.2d 111, 114 (4th Cir. 1981)).  The amended complaint plausibly alleges that Blackmon and MacFayden directed deputies to regularly trespass onto the curtilage of private residences.  (Doc. 18-1 ¶ 38 (alleging Blackmon and MacFayden directed Sanchez "that if it appeared the residents of a home regularly used a door to access a home, she should also approach that door to serve papers, even if it was within the home's curtilage and was not the door used by members of the general public."); ¶ 39 ("As a result of Defendants Blackmon and MacFayden's training, Ms. Sanchez routinely entered homes' backyards, side yards, and other areas not open to the general public when serving papers," as did other officers of the Randolph County Sheriff's Office).)  The proposed amended complaint's allegations claim that "Blackmon and MacFayden directed, condoned, and approved" of Sanchez's actions.  (<u>Id.</u> ¶ 47.)  Because the merit of this claim turns on issues of fact and Plaintiffs have alleged that Blackmon and MacFayden endorsed Sanchez's conduct that allegedly violated the Fourth Amendment, this claim would survive a motion to dismiss on this ground and is therefore not futile. Defendants' contention that Plaintiffs did not allege Blackmon and MacFayden personally participated in the alleged deprivation of Fourth Amendment rights is unavailing for similar reasons. Plaintiffs' claim that Blackmon and MacFayden directed Sanchez to serve civil papers in a manner that violated the Fourth Amendment

14

rights of Randolph County citizens is sufficient at the pleading stage.

Defendants' argument that the amended complaint fails to allege Monell liability based on supervisory liability or for failure to train is also unpersuasive. The gravamen of the amended complaint's Monell claim is that the Randolph County Sheriff's Office "maintained an unconstitutional policy, pattern, and practice of training, permitting, and directing officers to enter private areas of residence without a warrant, consent, or exigent circumstances." (Doc. 18-1 ¶ 129.) Plaintiffs allege this amounted to training officers to violate the Constitution and that the challenged practice was "widespread and persistent." (Id.) Nevertheless, Plaintiffs allege, Seabolt and his office "approved" of this "unconstitutional conduct" and were "deliberately indifferent to the deficiencies within [their] policies, practices, and customs; [were] deliberately indifferent to the risks those deficiencies created; and [were] deliberately indifferent to the Fourth Amendment rights of residents of Randolph County." (Id. ¶¶ 129-30.) The merit of this claim depends on factual development. Yet, it cannot be said that it is futile. Accordingly, Plaintiffs' motion for leave to amend the complaint will be granted.

Plaintiffs also request, without opposition from Defendants, that the amended complaint be deemed filed on the date Plaintiffs

filed their motion to amend. (Doc. 19 at 6.) This is the standard practice. Because Plaintiffs' motion for leave will be granted, the amended complaint will be deemed timely and filed as of March 28, 2025. See Brown v. Belt, No. 2:15-cv-11549, 2019 WL 1302627, at *5 (S.D.W. Va. Mar. 21, 2019) (deeming amended complaint filed as of the date of the motion to amend and citing cases).

**B.  Motion for Summary Judgment**

Defendants offer multiple grounds in support of their motion for summary judgment. First, they argue that Plaintiffs' unlawful search and seizure claim fails because Sanchez's actions were a lawful "knock and talk," an exception to the Fourth Amendment warrant requirement. (Doc. 24 at 2, 8–12.) Second, they argue Sanchez's use of force was reasonable and therefore lawful. (Id. at 13–16.) Third, they contend that Plaintiffs cannot bring a due process claim related to the shooting because it is properly analyzed as an unlawful seizure claim. (Id. at 16.) Fourth, they argue that Seabolt and Sanchez are entitled to immunity. (Id. at 16–24.) Fifth, they contend that the lawfulness of the search and alleged seizure defeats Plaintiffs' state tort claims. And finally, they allege that Cincinnati Insurance Company has no liability because the claims against Seabolt and Sanchez fail. (Id. at 26.) Each is addressed below.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant

16

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Basnight v. Diamond Devs., Inc., 146 F. Supp. 2d 754, 760 (M.D.N.C. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). In determining a motion for summary judgment, the court views the "evidence in the light most favorable to the non-moving party, according that party the benefit of all reasonable inferences." Id. (citation omitted). Summary judgment should be denied "unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances." Guessford v. Pa. Nat'l Mut. Cas. Ins. Co., 983 F. Supp. 2d 652, 659 (M.D.N.C. 2013) (quoting Campbell v. Hewitt, Coleman & Assocs., Inc., 21 F.3d 52, 55 (4th Cir. 1994)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are [fact-finder] functions . . . ." Anderson, 477 U.S. at 255. Therefore, on summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. (citation omitted).

While the movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact, once that burden has been met, the non-moving party must demonstrate the existence

17

of a genuine dispute of material fact. Bouchat v. Balt. Ravens Football Club, Inc., 346 F.3d 514, 522 (4th Cir. 2003); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). A mere scintilla of evidence is insufficient to avoid summary judgment. Anderson, 477 U.S. at 252; Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013) ("[T]he nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."); see also Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987) (noting that there is an affirmative duty for "the trial judge to prevent factually unsupported claims and defenses from proceeding to trial" (citation and internal quotation marks omitted)). Instead, the nonmoving party must convince the court that, upon the record taken as a whole, a rational trier of fact could find for the nonmoving party. Anderson, 477 U.S. at 248–49. Trial is unnecessary only if "the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315–16 (4th Cir. 1993).

### 1. Whether Sanchez's Search was a Knock and Talk

Defendants argue that Sanchez's presence on the Freemans' property was a lawful "knock and talk," and so they are entitled to judgment as to Plaintiffs' unreasonable search claim. (Doc. 24 at 8–12.) Plaintiffs reply that Sanchez's journey around the

18

Freeman property exceeded the scope of the knock and talk exception to the Fourth Amendment warrant requirement. (Doc. 26 at 8-12.)

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable." Wilson v. Arkansas, 514 U.S. 927, 931 (1995) (citation and internal quotation marks omitted). When a law enforcement officer physically enters a home's "curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred." Collins v. Virginia, 584 U.S. 586, 593 (2018) (citing Florida v. Jardines, 569 U.S. 1, 11 (2013)). An intrusion into a home's curtilage without a warrant is "presumptively unreasonable under the Fourth Amendment." United States v. McNeil, 126 F.4th 935, 943 (4th Cir. 2025) (citing Collins, 584 U.S. at 593).

Viewing the evidence in Plaintiffs' favor reveals a genuine dispute of material fact regarding whether Sanchez's entry into the Freemans' backyard and onto the back deck placed her in the area "immediately surrounding and associated with the home" wherein "privacy expectations are most heightened." Jardines, 569 U.S. at 6-7 (first quoting Oliver v. United States, 466 U.S. 170, 176 (1984); and then quoting California v. Ciraolo, 476 U.S. 207, 213 (1986)). Kimberly Freeman's declaration states that the

19

family's backyard was "obvious[ly]" a "private area that is not open to the public." (Doc. 26-5 ¶ 4.) Sanchez acknowledged that she could not see the Freemans' backyard from her parked car, (Doc. 26-3 at 17), and Kimberly Freeman reports that when Sanchez "walked around the side of [her] house and entered [her] backyard, she observed a number of items that people could not see from the road or after parking in [the] driveway" including a lawnmower and a four-wheeler. (Doc. 26-5 ¶ 5.) Moreover, the Supreme Court has stated that "[t]he front porch is the classic exemplar" of a home's curtilage. Jardines, 569 U.S. at 7. It is impossible to imagine that homeowners possess a lesser privacy interest in their back porch and the yard that surrounds it. See also United States v. Jackson, 728 F.3d 367, 374 (4th Cir. 2013) (holding that the back patio of an apartment, but not the common area courtyard adjacent to the patio, qualified as the apartment's curtilage).

It is true, as Sanchez argues, that a valid "knock-and-talk" represents an exception to the Fourth Amendment's requirement that an officer possess a warrant to enter a home's curtilage. See Jardines, 569 U.S. at 8. Broadly speaking, the knock-and-talk exception permits a police officer not armed with a warrant to "approach a home and knock, precisely because that is 'no more than any private citizen might do.'" Id. (quoting Kentucky v. King, 563 U.S. 452, 469 (2011). And although modest extensions to the scope and duration of an officer's visit may be permitted where

20

he or she possesses a legitimate law enforcement purpose that justifies the extension, <u>Alvarez v. Montgomery Cnty.</u>, 147 F.3d 354, 358 (4th Cir. 1998), officers may not use a knock and talk as justification for performing a "general investigation on a home's curtilage." <u>Covey v. Assessor of Ohio Cnty.</u>, 777 F.3d. 186, 193 (4th Cir. 2015) (citations omitted).

Determining whether Sanchez's decision to enter the Freemans' carport, walk through it and into their backyard, step onto their back deck, and knock on their back door was a valid "knock-and-talk" or an unlawful general investigation into the home's curtilage will require the court to resolve factual disputes that are not amenable for summary judgment. On this record, Plaintiffs have presented evidence that, if credited, would allow a factfinder to determine that Sanchez exceeded the scope of the limited knock and talk exception to the Fourth Amendment. Accordingly, Defendants' motion for summary judgment on this ground will be denied.

### 2. Whether Shooting Major was Unreasonable

Defendants next argue that Sanchez's decision to shoot Major was not unreasonable and therefore she is entitled to summary judgment on Plaintiffs' unreasonable seizure claim. (Doc. 24 at 13-16.) Plaintiffs respond that the shooting was an unreasonable seizure unless Major presented an imminent threat to Sanchez's safety, which they contend he did not. (Doc. 26 at 16-20.) They

21

also argue that there are disputed questions of fact that will bear on the reasonableness of Sanchez's decision to shoot the dog. (Id. at 17.)

Here again, genuine disputes of material fact preclude summary judgment for Defendants. The parties dispute where Major and Sanchez were positioned when the shooting occurred. Plaintiffs have offered evidence that Major was near the middle of the deck, approximately ten feet away from Sanchez, and that Sanchez was on the steps of the deck, but Sanchez claimed Major was fewer than two feet away from her. (Doc. 24-4 at 19; Doc. 26-3 at 49.) Kimberly Freeman also testified that when she first saw Sanchez, the deputy was on the steps to the deck and already had her gun out, pointing it at the dog. (Doc. 24-4 at 20-21.) The parties have also offered competing accounts of Major's demeanor, which will bear on the reasonableness of Sanchez's conclusion that he posed a threat. Kimberly Freeman reports that Major was underneath the kitchen window and was not charging or running at the deputy, but rather standing still. (Doc. 26-5 ¶ 7.) According to her, Major was "too far away from Deputy Sanchez to bite her or jump on her when she shot him." (Id. ¶ 8.) Sanchez testified that Major was "snarling, growling, showing teeth" and though he jumped when he came out of the dog door, he "stood there" and she felt "he was getting ready to pounce" on her. (Doc. 26-3 at 45-46.) The parties also contest the availability and feasibility of

22

alternative measures Sanchez could have employed to repel Major. Sanchez was aware the household had a dog, based on the barking she heard when she knocked on the front door, and in all prior experiences she used pepper spray. (Id. at 3–4.) Each of these disputed questions are material to the determination whether Sanchez used reasonable force. Summary judgment for Defendants on this issue is therefore unwarranted.

### 3. Plaintiffs' Due Process Claim Related to the Shooting

Defendants, citing Safar v. Tingle, 859 F.3d 241, 245 (4th Cir. 2017), point out that "[t]he due process provisions of the Fourteenth Amendment are inapplicable to a claim of seizure." (Doc. 24 at 16.) Plaintiffs did not respond to this argument, therefore forfeiting any opposition. The court agrees with Defendants that "the Due Process Clause is simply not implicated" in this case. Safar, 859 F.3d at 245 (citation and internal quotation marks omitted). Therefore, Defendants' motion for summary judgment will be granted on Plaintiffs' due process claim (Fourth Cause of Action).

### 4. Seabolt and Sanchez Immunity

Defendants contend that Sanchez and Seabolt are protected by various forms of immunity. (Doc. 24 at 16–24.) Defendants assert that Sanchez possesses qualified immunity from Plaintiffs' constitutional claims and public official immunity from their state

23

tort claims. (Id. at 17–21, 23–24.) They also argue that Seabolt, sued only in his official capacity as sheriff, is protected by sovereign immunity. (Id. at 21–23.) Plaintiffs argue that Sanchez is not entitled to qualified immunity for either constitutional claim. (Doc. 26 at 12–15, 20–21.) They also contend that she should be denied public official immunity for the same reasons she is not entitled to qualified immunity or, alternatively, that a reasonable juror could conclude she acted with malice. (Id. at 21–23.) As for Seabolt, Plaintiffs argue he has "waived governmental immunity in the amount of his surety bond—$25,000;" however, they "agree with Defendants that [the] general liability policy supports no further waiver." (Id. at 21.) Defendants acknowledge that "assuming any state tort claims survive summary judgment, [Seabolt] has waived sovereign immunity up to $25,000 by purchase of his bond." (Doc. 27 at 11.)

### a. Seabolt

There is no genuine dispute of material fact with respect to Seabolt's waiver of sovereign immunity. North Carolina sheriffs "are immune from suit absent a waiver of immunity." Simmons v. Corizon Health, Inc., 122 F. Supp. 3d. 255, 268 (M.D.N.C. 2015) (citing Phillips v. Gray, 592 S.E.2d 229, 232 (N.C. App. 2004)). But this sovereign immunity may be waived by "by consenting to suit, purchasing liability insurance, or purchasing a bond." Safford v. Barnes, 191 F. Supp. 3d 504, 506 (M.D.N.C. 2016) (citing

24

Sellers v. Rodriguez, 561 S.E.2d 336, 339 (N.C. App. 2002)). As both parties agree, Seabolt has waived sovereign immunity to the extent of his bond coverage — $25,000 — but no more.

### b. Qualified Immunity

Qualified immunity shields government officials performing discretionary functions from personal liability for civil damages under section 1983, so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006) (quoting Wilson v. Layne, 526 U.S. 603, 609 (1999)) (internal quotation marks omitted). Officials are entitled to immunity unless the section 1983 claim satisfies a two-pronged test: (1) the allegations, if true, substantiate a violation of a federal statutory or constitutional right, and (2) the right was "clearly established" such that a reasonable officer would have known his acts or omissions violated that right. Id. The court may consider the prongs in either order, as a plaintiff's failure to satisfy either entitles the officer to immunity. Pearson v. Callahan, 555 U.S. 223, 236 (2009). "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011) (citation

25

modified).

Because Plaintiffs have demonstrated genuine disputes of material fact that bear on whether Sanchez's conduct violated their Fourth Amendment rights, the question is whether it was "clearly established" at the time of the incident in 2022 that her conduct would violate the Fourth Amendment. See Pearson, 555 U.S. at 236.

Citing Covey v. Assessor of Ohio County, 777 F.3d 186 (4th Cir. 2015), Plaintiffs argue that at the time of the incident it was clearly established that Sanchez's entry into the backyard and onto the back deck violated the Fourth Amendment. (Doc. 26 at 12–13.) As Plaintiffs see it, the knock and talk exception is narrow: it permits an officer to approach a dwelling by the front path and knock on the front door, but if the officer does not receive a response, she must "leave without anything more." (Id. at 12.) Plaintiffs rely heavily on the Supreme Court's description of the knock and talk exception as a license to "approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." (Id. at 9 (quoting Jardines, 569 U.S. at 8) (internal quotation marks omitted).) Plaintiffs also parrot the Supreme Court's observation that compliance with the knock and talk exception is uncomplicated. (Id.) As the Court majority put it, "[c]omplying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's

26

Girl Scouts and trick-or-treaters." Jardines, 569 U.S. at 8. At the most basic level, Plaintiffs contend, it was clearly established that an officer who approached the front door of a dwelling, knocked on it, and, despite not receiving a response, traveled into the home's backyard and knocked a second time on the back door was conducting an unlawful warrantless search rather than acting pursuant to the knock and talk exception.

Defendants argue that the law was not so cut and dried at the time of the incident. They point to Alvarez v. Montgomery County, 147 F.3d 354 (4th Cir. 1998), to argue that it was not clearly established that the knock and talk exception encompassed a single knock at the front door of the residence, and nothing more. (Doc. 24 at 18.) Defendants also rely on United States v. McNeil, 126 F.4th 935 (4th Cir. 2025), in support of their argument that it was not clearly established that Sanchez's second knock at the Freeman residence exceeded the scope of the knock and talk exception.

Starting in reverse order, McNeil involved a drug conviction. Id. at 940. There, the defendant contended on collateral review that his counsel was ineffective for failing to move to suppress evidence discovered during a purported knock and talk. Id. After officers knocked at McNeil's door, his children told the officers that he was not home. Id. Evidently undaunted, the officers proceeded into the backyard and knocked on a small shed behind the

27

home.  Id.  The officers discovered McNeil, firearms, and a quantity of marijuana in the shed.  Id.  McNeil pleaded guilty to drug and firearm offenses that were supported by evidence the police discovered during their investigation of his property, and his conviction was affirmed on direct review.  Id.  On collateral review, the district court rejected McNeil's claim that his counsel rendered ineffective assistance by failing to move to suppress the evidence seized from the shed, finding that the officers' conduct was a constitutional knock and talk.  Id. at 941.

The Fourth Circuit reversed and directed the district court to hold an evidentiary hearing on McNeil's ineffective assistance of counsel claim.  Id. at 945, 947.  The panel reasoned in part that "[n]one of [the Fourth Circuit's] cases applying Jardines has approved a curtilage entry after an unsuccessful stop at the front door, and it is not clear that the police officers here were entitled to [a] second bite at the apple."  Id. at 944.  Therefore, the panel reasoned, a motion to suppress the evidence may have had "some substance."  Id. at 943.

Defendants refer to the court's equivocation that it was "not clear that the police officers" in McNeil's case "were entitled to a second bite at the apple" to argue that it was not "clearly established" prior to the decision that entering the backyard of a home after knocking at the front door of a residence was beyond the scope of the knock and talk exception.  (Doc. 24 at 19.)  They

28

also contend that the trial court's conclusion that the officers' conduct was a valid knock and talk demonstrates that it was not "clearly established" that Sanchez's actions violated the Fourth Amendment. (Doc. 27 at 6.)

The Fourth Circuit applies a split burden of proof for the affirmative defense of qualified immunity. Plaintiffs bear the burden of showing a violation of their rights, and the defendant bears the burden of proving that the right was not clearly established. Stanton v. Elliott, 25 F.4th 227, 233 (4th Cir. 2022). For a right to be clearly established, "its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Hope v. Pelzer, 536 U.S. 730, 739 (2002) (citations omitted). However, it is not necessary that the precise "action in question has previously been held unlawful." Id. Rather, "in light of pre-existing law the unlawfulness must be apparent." Id. (internal quotation marks omitted). That is to say, an officer has a right to fair notice of the unlawfulness of the conduct. Id. Where the underlying facts upon which the qualified immunity question depends are genuinely disputed, summary judgment should not be granted to a defendant. Stanton, 25 F.4th at 234 (citing Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc)).

Here, Plaintiffs have presented facts which, if believed, would support a finding of a violation of their Fourth Amendment

rights, and Sanchez has not demonstrated that it was not clearly established that she lacked the right to extend the license granted by the knock and talk exception to enter the Freemans' backyard and onto the back deck which, under the Freemans' version of the disputed facts, led to her shooting the dog.

When Sanchez visited the Freeman home on April 1, 2022, it was clearly established that a warrantless search of a home's curtilage violated the Fourth Amendment. See Collins, 584 U.S. at 593. It was also clearly established that a valid knock and talk, which the Supreme Court has described as "approach[ing] the home by the front path, knock[ing] promptly, wait[ing] briefly to be received, and then (absent invitation to linger longer) leav[ing]," is an exception to this general rule. Jardines, 569 U.S. at 8. Had this been all Sanchez did, she would have been entitled to summary judgment on Plaintiffs' claim for an unreasonable search based on qualified immunity. But the record instead contains material disputes that bear on whether Sanchez violated Plaintiffs' clearly established right to be free from warrantless searches of the curtilage of their home; namely, whether Sanchez entered the home's curtilage without a warrant and, if so, whether in doing so she exceeded the scope of her authority under the Fourth Amendment. See Stanton, 25 F.4th at 237 (finding grant of summary judgment on qualified immunity in

30

officer's favor improper where a genuine dispute of fact remained "that might prove a violation of a clearly established right").

Defendants' reliance on Alvarez does not compel a different result. Alvarez is factually distinguishable and, importantly, predates the Supreme Court's decision in Jardines by fifteen years. In Alvarez, officers investigating a report of underage drinking at a neighborhood party located a home with alcohol containers strewn about the front yard and "several cars parked there in an 'odd' fashion." 147 F.3d at 356. The officers "approached the front door intending to notify the [homeowners] of the complaint and to request that no one drive away from the party while intoxicated." Id. at 357. But once they arrived at the home's front stoop, they noticed a sign that read "Party In Back" and displayed an arrow pointing towards the home's backyard. Id. After seeing the sign, the officers did not knock, and instead proceeded directly to the backyard. Id. The homeowners sued pursuant to section 1983, alleging in relevant part "that the officers' warrantless entry into their backyard violated the Fourth Amendment." Id. The Fourth Circuit found no Fourth Amendment violation because the officers possessed a legitimate reason for entering the backyard that was not connected to a desire to search the premises: they believed they would be able to "speak with the party's host" there. Id. at 358–59. Therefore, "[i]t was not unreasonable" for the officers "to enter the backyard when

31

circumstances indicated they might find the homeowner there." Id. at 359.

Here, the evidence, viewed in Plaintiffs' favor, fails to support any reason Sanchez would have believed she would find the homeowners in their backyard or on the back deck. Sanchez admitted as much in her deposition. (Doc. 26-3 at 21.) And to the extent Alvarez could be read to sanction a broader understanding of the knock and talk exception to the warrant requirement than the Supreme Court endorsed in Jardines, it has been abrogated. See also McNeil, 126 F.4th at 944 ("None of our cases applying Jardines has approved a curtilage entry after an unsuccessful stop at the front door, and it is not clear that the police officers here were entitled to this second bite at the apple."). A jury could find that the evidence indicates that the Freemans' back deck and doors were not areas regularly used by the general public to access the home, but were rather part of the home's private curtilage. Accordingly, Defendants' motion for summary judgment on Plaintiff's unreasonable search claim based on qualified immunity will be denied.

The parties' briefing devoted considerably less attention to whether it was clearly established that Sanchez's decision to shoot Major violated the Fourth Amendment. Nevertheless, to the extent Defendants seek summary judgment on this basis as well based on qualified immunity, it will be denied. In Ray v. Roane, the Fourth

32

Circuit concluded that "it is well-settled that privately owned dogs are effects under the Fourth Amendment, and that the shooting and killing of such a dog constitutes a seizure." 948 F.3d 222, 227 (4th Cir. 2020) (citation modified). "The use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable." Id. at 230 (citation modified). And where there are questions of fact that bear on whether an officer's decision to shoot a privately-owned dog was reasonable, summary judgment is inappropriate. See Ray v. Roane, 93 F.4th 651, 652-53, 658 (4th Cir. 2024) ("Ray II"). Here, as noted previously, Plaintiffs have produced evidence that sufficiently disputes Sanchez's claim that Major posed an immediate threat to her and that her decision to fire her sidearm was reasonable. See Ray II, 93 F.4th at 655 ("By the time of the shooting in 2017 . . . it was clearly established . . . that 'the use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable." (citations omitted)). Consequently, Defendants' motion for summary judgment on Plaintiff's excessive force claim based on qualified immunity will be denied.

### c. Public Official Immunity

Defendants argue that even if Sanchez is not entitled to qualified immunity, she is entitled to public official immunity for the state law claims under North Carolina law. (Doc. 24 at

33

23-24; Doc. 27 at 11-12.)  Plaintiffs contend that public official immunity may be pierced if the plaintiff proffers evidence from which "[a] jury could find Sanchez acted with malice."  (Doc. 26 at 21-23).

In North Carolina, the doctrine of public official immunity "protects public officials from individual liability for negligence in the performance of their governmental or discretionary duties." Campbell v. Anderson, 576 S.E.2d 726, 730 (N.C. App. 2003) (citing Harwood v. Johnson, 388 S.E.2d 439, 445 (N.C. 1990)).  Police officers are public officials who "enjoy absolute immunity from personal liability for their discretionary acts done without corruption or malice." Schlossberg v. Goins, 540 S.E.2d 49, 56 (N.C. App. 2000) (citation omitted).  North Carolina presumes that a public official in the performance of his official duties "acts fairly, impartially, and in good faith and in the exercise of sound judgment or discretion, for the purpose of promoting the public good and protecting the public interest." Greene v. Town of Valdese, 291 S.E.2d 630, 632 (N.C. 1982) (citation modified).  Thus, a public official is entitled to immunity from suit in his individual capacity "unless he engaged in discretionary actions which were allegedly: (1) corrupt; (2) malicious; (3) outside of and beyond the scope of his duties; (4) in bad faith; or (5) willful and deliberate." Smith v. Jackson Cnty. Bd. of Educ., 608 S.E.2d 399, 411 (N.C. App. 2005) (citations

34

and internal quotation marks omitted). "To survive a motion for summary judgment based on public official immunity, a plaintiff must make a prima facie showing that the defendant-official's tortious conduct falls within one of the immunity exceptions." Bartley v. City of High Point, 873 S.E.2d 525, 534 (N.C. 2022) (citing Dempsey v. Halford, 645 S.E.2d 201 (N.C. App. 2007)).

"A defendant acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he intends to be prejudicial or injurious to another." Thomas v. Sellers, 542 S.E.2d 283, 286 (N.C. App. 2001) (quoting Grad v. Kaasa, 321 S.E.2d 888, 890 (N.C. 1984)). North Carolina courts have explained that unlike the federal immunity standard, which is an objective test, the North Carolina standard (at least as to malice and corruption) is an inquiry into the subjective state of mind of the government actor. Andrews v. Crump, 547 S.E.2d 117, 123 (N.C. App. 2001); cf. Cooper v. Sheehan, 735 F.3d 153, 160 (4th Cir. 2013) (explaining that the state law "man of reasonable intelligence standard" is "functionally identical" to federal "clearly established" standard).

Here, Plaintiffs focus solely on the "malice" exception to public official immunity.[3] They have failed to produce or identify

---

[3] Plaintiffs offer a passing remark that "Sanchez acting with such disregard for the Freemans' constitutional rights cannot square with her duties as a law enforcement officer[,]" but they do not develop an argument that she was acting outside of or beyond the scope of her duties as an officer as grounds for piercing immunity. (Doc. 26 at 22.)

any evidence suggesting that Sanchez entered their backyard with the subjective intent to prejudice or injure them or their property. See Thomas, 542 S.E.2d at 286. Contrary to their argument in opposition to summary judgment, Plaintiffs' evidence does not support an inference that Sanchez's decision to enter the backyard and knock on the back door was "plainly intended to injure." (Doc 26 at 22.) Instead, the evidence suggests she was simply attempting serve Larry Freeman with the show cause order in a manner consistent with her training even though, Plaintiffs argue, that training was unconstitutional. That fails to demonstrate that she "maliciously" violated the Fourth Amendment, particularly where the law presumes "that public officials will discharge their duties in good faith and exercise their powers in accord with the spirit and purpose of the law" absent evidence to the contrary. Bartley, 873 S.E.2d at 533 (citation modified). Accordingly, Sanchez is entitled to public immunity with respect to Plaintiffs' trespass claim, and Defendants' motion for summary judgment will be granted on this claim.

There are, however, genuine disputes of material fact that could allow a jury to conclude that Sanchez acted maliciously in needlessly shooting Major. Viewed in the light most favorable to Plaintiffs, the evidence suggests that Major was approximately ten feet away from Sanchez when she fired her weapon and that he was not behaving aggressively toward her. (Doc. 26-3 at 19; Doc. 26-

5 ¶¶ 7-8.) A jury might also infer malice from the evidence that Sanchez had previously successfully repelled aggressive dogs on numerous occasions using her pepper spray but elected to shoot Major instead. (Doc. 26-3 at 3-8.) And while Sanchez did state that she did not have time to resort to her pepper spray, it is up to a jury whether to credit that explanation, especially in light of the fact that Sanchez acknowledged awareness of a family dog barking when she knocked at the front door. Defendants argue that the fact that Sanchez was upset and crying after shooting Major, and kept saying she was "sorry," counters this conclusion. (Doc. 27 at 12.) While this may be persuasive to a jury, on summary judgment, the court cannot weigh these facts. The Plaintiffs' facts, if credited, would permit a jury to find that Sanchez's decision to shoot Major was malicious (even if she was thereafter sorry to have done so), that an officer of reasonable intelligence would have known it was contrary to her duty to do that, and that the shooting was calculated to prejudice or injury Plaintiffs' property. See Thomas, 542 S.E.2d at 286. Consequently, Sanchez is not entitled to summary judgment on Plaintiffs' remaining state tort claims based on public official immunity.

### 5. Plaintiffs' Remaining State Law Claims

Defendants argue for summary judgment as to Plaintiffs' state law claims for trespass to chattels, conversion, assault, negligent infliction of emotional distress, and intentional

37

infliction of emotional distress on the ground that Sanchez's conduct was lawful. (Doc. 24 at 24–26.) Plaintiffs respond that Sanchez's conduct was unlawful and that a jury could find that by "invading a private backyard and shooting a dog that had barked at her," Sanchez performed an act that can serve as the predicate for each of these claims, including intentional infliction of emotional distress. (Doc. 26 at 23–26.)

Defendants have not shown they are entitled to summary judgment on Plaintiffs' intentional tort claims. There are genuine disputes of material fact as to each of them. As Defendants concede: Trespass to chattel requires an "unauthorized, unlawful interference or dispossession of the property." Fordham v. Eason, 521 S.E.2d 701, 704 (N.C. 1999) (citations omitted). Conversion, "in effect," has two essential elements: "ownership in the plaintiff and wrongful possession or conversion by the defendant." Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC, 723 S.E.2d 744, 747 (N.C. 2012) (citation omitted). Proof of assault requires "intent, offer of injury, reasonable apprehension, apparent ability, and imminent threat of injury." Hawkins v. Hawkins, 400 S.E.2d 472, 475 (N.C. App. 1991) (citation omitted). Here, Plaintiffs have provided evidence that, if credited, would tend to establish that Sanchez's use of force in shooting Major was unlawful, wrongful, and caused Kimberly Freeman and C.B. to fear imminent bodily injury. As to Plaintiffs' claim

of intentional infliction of emotional distress, the gravamen of that claim is proof that a defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Clark v. Clark, 867 S.E.2d 704, 715 (N.C. App. 2021) (citation and internal quotation marks omitted). If a jury were to credit Kimberly Freeman's testimony, it could find that Sanchez's shooting of the dog under the circumstances was an overreaction and extreme and outrageous. Thus, summary judgment on this claim will be denied as well.

Finally, Defendants contend that Plaintiffs' claim for negligent infliction of emotional distress alleges only negligence and is therefore barred by official immunity. (Doc. 24 at 25.) Plaintiffs respond that because they have offered proof of malice, as noted above, they are entitled to proceed on this claim. (Doc. 26 at 23.) At least at this stage, Plaintiffs are correct. Plaintiffs' proffer of evidence as to malice suffices to require a jury to resolve this factual issue. See Russ v. Causey, 468 F. App'x 267, 272-76 (4th Cir. 2012) (unpublished) (permitting claim of negligent infliction of emotional distress to proceed based on evidence of malice, and noting that "malice, for the purposes of piercing the cloak of [a] public officer's immunity" may be shown "by conduct: (1) 'when done needlessly, manifesting a reckless

39

indifference to the rights of others,' (2) 'which a person of reasonable intelligence would know to be contrary to [her] duty,' and (3) 'which is intended to be prejudicial or injurious to another') (original alterations adopted) (citations omitted).[4] For this reason, Defendants' motion for summary judgment with respect to Plaintiffs' this claim will be denied.

### 6.  Cincinnati Insurance Company Liability

Defendants concede that Cincinnati Insurance Company's liability is derivative of the liability of Sanchez and Sheriff Seabolt under North Carolina General Statute § 58-76-5.  (Doc. 24 at 26.)  Because the court has declined to grant Defendants' motion for summary judgment as to Seabolt (to the extent of coverage) and Sanchez, entry of summary judgment in Cincinnati Insurance Company's favor is inappropriate.  The motion will therefore be denied.

### III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Plaintiff's motion for leave to file an amended complaint (Doc. 18) is GRANTED.  Plaintiff shall file the amended complaint (Doc. 18-1) as a separate pleading within five (5) days of the date of this Order.  The amended

---

[4] Unpublished opinions of the Fourth Circuit are not precedential but can be cited for their persuasive, but not controlling, authority.  See Collins v. Pond Creek Mining Co., 468 F.3d 213, 219 (4th Cir. 2006).

complaint will be deemed timely filed as of March 28, 2025.

IT IS FURTHER ORDERED that Defendants' motion for summary judgment (Doc. 23) is GRANTED as to Plaintiffs' Second Cause of Action (Trespass) and Fourth Cause of Action (U.S.C. § 1983 and U.S. Const. Amend. XIV – Intentional Deprivation of Property without Due Process of Law), and those claims are DISMISSED. The motion is otherwise DENIED.


                                    /s/    Thomas D. Schroeder
                                 United States District Judge
August 20, 2025